

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

**ENTERED**
**06/27/2007**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **MARIA C. CADENGO** | § | **CASE NO. 06-30429** |
| | § | |
| **Debtor** | § | **Chapter 13** |
| | § | |
| _____ | § | _____ |
| **MARIA C. CADENGO** | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| **vs.** | § | **ADVERSARY NO. 06-3469** |
| | § | |
| **CONSOLIDATED FUND** | § | |
| **MANAGEMENT, LLC; PREMIER** | § | |
| **HOME LOANS, LLC; and** | § | |
| **WOLVERINE MORTGAGE** | § | |
| **PARTNERS, LLC** | § | |
| | § | |
| **Defendants** | § | |

## MEMORANDUM OPINION ON DEBTOR'S COMPLAINT TO DETERMINE VALIDITY AND EXTENT OF LIEN
### [Docket No. 1]

### I.   INTRODUCTION

Maria Cadengo (Maria or the Debtor) filed this adversary proceeding against Consolidated

Fund Management, LLC (Consolidated), Wolverine Mortgage Partners, LLC (Wolverine), and

Premier Home Loans, LLC[1] (collectively, the Defendants) seeking to invalidate a lien on her claimed

homestead because the Defendants allegedly provided a home equity loan that violated numerous

---

[1] Premier Home Loans, LLC is the corporation wholly owned and controlled by Chazz Vidaurre, the catalyst of the disputed transaction. Although being named as a defendant, Premier Home Loans, LLC has never filed an answer in this adversary proceeding. Additionally, the Debtor intended to call Vidaurre as a witness, but was unable to serve a subpoena on him prior to trial. Likewise, the Defendants stated that they had no knowledge of Vidaurre's whereabouts.

provisions of the Texas Constitution.[2]  The Defendants answer that the transaction was actually a purchase of the home by the Debtor from her father, rather than a home equity loan on a homestead that she had previously established.  First, the Court finds that the Debtor held equitable title to the property pursuant to her parents' divorce decree, and that this title, coupled with possession, is sufficient to establish a homestead under Texas Law.  Next, the Court holds that the Defendants may not rely upon a homestead waiver executed by the Debtor because they had actual knowledge of her use and possession of the property.  Finally, the Court determines that the home equity loan violated several sections of the Texas Constitution, and the Defendants must forfeit the entire principal and interest of the loan.

## II.    FINDINGS OF FACT

1.      In 1993, Jose Cadengo (Jose), his wife Nora Cadengo (Nora), and their two children moved into the house located at 310 Sylvester Rd., Houston, Texas (the Property).[3]

2.      On July 9, 2001, a final divorce decree, arrived at between Jose and Nora through mediation, was entered in the 309th Judicial District of Harris County, Texas (the Divorce Decree).  [Ex. No. 2.][4]

---

[2] Counsel for all parties deserve credit for prosecuting and defending against this adversary proceeding efficiently and effectively; this Court very much appreciates their professionalism.

[3] No transcript of the trial was made.  All findings of fact without citations are based upon testimony adduced at the trial held on March 14 and 15, 2007.

[4] All exhibit citations refer to the joint exhibits submitted by the parties at the trial on March 14 and 15, 2007. The table of contents of the joint exhibits show that numbers 1 through 22 belong to the Debtor, and numbers 23 through 25 belong to the Defendants.

3.    As a result of the marital discord and eventual divorce, there were periods of time where Jose or Nora was the sole parent living at the Property.  However, since moving into the Property in 1993, the Debtor and her younger brother have only resided at the Property.

4.    The Divorce Decree states that after the divorce, the Property would be Jose's sole and separate property, and that Nora would be divested of all right, title, or interest in the Property.  [Ex. No. 2, pp. 9-10.]  The Divorce Decree also requires both Jose and Nora to execute a warranty deed for the Property "to the minor children once they have reached the age of 18 years." [Ex. No. 2, p. 10.][5]

5.    At the time Jose and Nora entered into the Divorce Decree, they had two minor children: Maria, who was born on July 18, 1985 and turned 18 on July 18, 2003; and Israel, who was born on July 2, 1988 and turned 18 on July 2, 2006.  [Ex. No. 2, p. 1.]

6.    Sometime after the divorce, Jose became engaged to another woman who was living in Mexico.  In order to bring his new fiancee to Texas, Jose needed $2,000.00 and sought the assistance of his ex-wife, Nora.

7.    During the fall of 2004, Nora met with a man named Chazz Vidaurre (Vidaurre) about obtaining a loan for Jose.  Vidaurre told Nora that he could not procure a loan for an amount less than $6,000.00.  After their initial meeting, Vidaurre asked for, and Nora provided to him, a copy of the Divorce Decree.

---

[5] This seems to be a drafting error.  If the Property was Jose's sole and separate property as a result of the divorce, there would be no need for Nora to join in the conveyance of the Property to the children several years later. Alternatively, this may not be a drafting error, but overly cautious lawyering to fend off any future problems with a title company.  Either way, Jose had the duty under the Divorce Decree to execute a deed conveying title to Maria and Israel once they turned 18.

8.　　After the initial meeting between Nora and Vidaurre, but prior to December 10, 2004, Vidaurre and Don Konipol (Konipol), the manager of Wolverine, visited the Property to make a visual inspection before approving the loan. Jose and Maria were both present at the Property during this inspection.

9.　　Although Vidaurre worked independently of Konipol and Wolverine, Wolverine had a business relationship with Vidaurre lasting several years and extended approximately 20 loans that he brought to it. Three of the last four loans Vidaurre brought to Wolverine resulted in litigation and Konipol terminated their relationship sometime in late 2005. Vidaurre has since disappeared.

10.　　Wolverine had a policy of making only business or commercial loans which were not secured by a homestead, and its loans were typically one year in duration. Konipol testified that Vidaurre led him to believe that the Property was going to be used as a rental property, not as a homestead.

11.　　Sometime prior to November 30, 2004, Jose and Maria executed a New Home Contract which stated that Jose would sell the Property to Maria. [Ex. No. 3.]

12.　　On December 10, 2004, Jose, Nora, and Maria attended the closing of the transaction which is at issue in this adversary proceeding (the Transaction). Vidaurre and Renee Goode (Goode), an agent of Fidelity National Title, were also present at the closing on the Transaction.

13.　　The following documents were executed at the closing on the Transaction:

- A Settlement Statement showing "cash to seller" of $6,664.61. [Ex. No. 1.]

- A Warranty Deed purporting to transfer the Property from Jose and Nora to Maria. [Ex. No. 4.]

- An Affidavit of Facts signed by both Nora and Jose stating that they both owned the Property. [Ex. No. 5.]

- A Promissory Note in the amount for $34,000.00 signed by Maria for the benefit of Consolidated which stated that the Debtor would be liable for interest payments for one year and the entire balance of the unpaid principal would be due less than one year later on November 30, 2005. [Ex. No. 6.]

- A First Lien Deed of Trust signed by Maria for the benefit of Consolidated. [Ex. No. 7.]

- A Business-Commercial Purpose Agreement signed by Maria stating that the Property would be used for "business, commercial, commercial agricultural, investment or other similar purposes and not primarily for personal, family, household or agricultural uses." [Ex. No. 10.]

- A Nonhomestead Affidavit and Designation of Homestead signed by Maria stating that she did not live at the Property and that her current homestead was 6413-1/2 Cochran, Houston, TX 77022. [Ex. No. 13.][6]

- A Marital Status Affidavit signed by Jose and Nora stating that they were divorced as of July 1, 2000. [Ex. No. 18.]

- An Arms Length Affidavit signed by Jose, Nora and Maria stating that: (a) the closing of the Transaction was an arms length transaction; (b) Jose and Nora would be vacating the Property; (c) Maria would be moving into the Property; and (d) the intent of Maria is to make the Property her homestead. [Ex. No. 19.][7]

- A Uniform Residential Loan Application signed by Maria. [Ex. No. 23.]

---

[6] This address was the home of Maria's mother, Nora. However, Nora, Maria and Jose all unequivocally testified that both Maria and Israel had never lived anywhere but at the Property. During the divorce, the parents separately took turns living at the Property with the children, but the two children never moved to any other residence.

[7] None of these statements included in the Arms Length Affidavit was true or correct. Nora did not live at the Property when the Transaction occurred, so saying that she would move out is fictitious. Next, both Jose and Maria lived at the Property before and also after the Transaction. The statement that it was Maria's "intent to purchase the property for [her] homestead" is false because Maria already lived at the Property. The Court wants to note that the actual title of this document is, unbelievably, "Arms Length Affidavit." The mere fact that Cadengos would be pressured into signing such a misnomer of a document casts aspersions on the credibility of the Defendants and the validity of the Transaction.

14.     The entire closing on the Transaction, including execution of all of the above-referenced documents, took less than 20 minutes to complete. Vidaurre directed the Cadengos where they needed to sign without giving an explanation of what documents they were signing.

15.     The total amount of the proceeds from the Transaction was $34,000.00. Of this amount, $12,278.83 was used to pay off the previous mortgage on the Property; $1,189.68 was used to pay past due property taxes; $10,000.00 was used to pay broker's fees to Wolverine and Premier;[8] closing costs were $3,866.88; and the cash received by Jose was only $6,664.61. [Docket No. 18, ¶ 11.][9] Of the cash received by Jose, he gave $2,000 to Nora as a fee for helping him obtain the loan and making contact with Vidaurre. The Transaction also included an $8,500.00 "seller's contribution." However, Jose never offered, and Maria never received, any of these funds. Vidaurre explained to Maria that this "pretend" money needed to be listed in the papers but that Jose was not actually obligated to bring that money to the closing on the Transaction.

16.     No translator was present at the closing on the Transaction. Neither Nora nor Jose speak fluent English. Although Maria can translate for her parents, and has done so in the past, she did not serve in this capacity at the closing on the Transaction. Neither Goode nor Vidaurre speak Spanish, and all their communication with the Cadengos was in English.

---

[8] Konipol conceded that $10,000.00 in broker fees on such a small loan was "excessive," but claimed he was unaware that Vidaurre was getting an equal payment because Vidaurre's typical fee was only 2-4%, which in this case would have been $480.00-$960.00 (i.e. 2-4% of $24,000.00). In light of the continuous and ongoing relationship between Wolverine and Vidaurre, the Court finds Konipol's claim of ignorance to be unlikely. Konipol testified that Wolverine's average fee was 6%, but that it always had a minimum of $5,000.00. The $10,000.00 broker fee in this case was almost 30% of the $34,000 total proceeds.

[9] All docket citations refer to the docket in the adversary proceeding number 06-3469 unless otherwise indicated.

17.    Nora and Jose understood the result of the Transaction to be that: (a) Jose had taken out a loan and had not sold the Property to Maria; (b) the amount of the loan was for the amount of the prior mortgage, plus the cash of $6,664.61 that Jose received from the Transaction; (c) Jose alone, and not Maria, was liable for repayment of the loan; and (d) Jose continued to own all of the Property.

18.    Jose did not intend to sell the Property to Maria on the date of the Transaction, but rather believed that Israel and Maria would automatically become owners of the Property when Israel turned 18.

19.    Maria understood the result of the Transaction to be that: (a) her father, not she, had taken out a loan; (b) the amount of that loan was $34,000.00; (c) she would not be personally liable for any payments on the loan; and (d) title was put in her name, but a year later it would revert to Jose.

20.    Maria acknowledged signing the Business-Commercial Purpose Agreement [Ex. No. 10] and the Non-Homestead Affidavit [Ex. No. 13], but was unable to explain what many of the key terms of these documents mean and had no comprehension of the legal effect of her signing them.

21.    Vidaurre, and not Maria, was responsible for filling out the paperwork executed at the closing of the Transaction. The paperwork is riddled with inaccuracies. For example, the Loan Application [Ex. No. 23] states that Maria's monthly income was $2,500 and that she had $2,500 in a savings account.[10] Her place of employment, the Downtown Aquarium, is

---

[10] Not only did Maria testify that these amounts were incorrect and had been invented by Vidaurre, the Schedules filed in the main bankruptcy case also contradict the Loan Application. Instead of $2,500.00 in the bank, her Schedule B lists only $5.00 cash on hand and a checking account at Bank of America with a zero balance. [Case No.

listed as "the Querjm." [*Id.*][11]  The Loan Application also states that she owned a life

insurance policy of $50,000 and a 1996 Dodge automobile—both of which were assets of

Jose, not Maria.

22.    For a year after the Transaction, payments were regularly made on the Promissory Note.

Maria was responsible for making the monthly payment of $397.67, along with the other bills

of the family, but the funds that were used to make the payment were provided by Jose from

his income.  This was the same system of managing the family finances that Jose and Maria

used before the Transaction.  Maria was employed at the Downtown Aquarium during this

year, but none of her income was used to pay the Promissory Note.

23.    In October of 2005, Konipol, on behalf of Wolverine, sent a notice of maturity to Maria

informing her that the entire principal of $34,000.00 would be due on November 30, 2005.

[Ex. No. 21.]

24.    On February 26, 2006, Maria filed a Chapter 13 petition. [Main Case No. 06-30429, Docket

No. 1.]

25.    On February 26, 2006, and continuing to the present day without interruption, Maria, Israel,

Jose, as well as his new wife and their two children, have all resided at the Property.

26.    On June 26, 2006, the Court confirmed the Debtor's Chapter 13 Plan. [Main Case No. 06-

30429, Docket No. 55.]

---

06-30429, Docket No. 1.]  Instead of monthly income of $2,500.00, her gross monthly income is listed in Schedule I as
$1,387.00. [*Id.*]

  [11] The Downtown Aquarium is a aquarium-themed restaurant in downtown Houston.

27.     On July 17, 2006, the Debtor initiated this adversary proceeding against the Defendants by

filing her original Complaint. [Docket No. 1.]

28.     On March 14 and 15, 2007, the Court held a trial on the Debtor's Complaint.


### III.    CREDIBILITY OF WITNESSES

At hearings held on March 14 and 15, 2007, the Court heard testimony from four witnesses: Jose Cadengo, Nora Cadengo, Maria Cadengo and Don Konipol, the manager of Wolverine.[12] Set forth below are this Court's findings regarding the credibility of each of these witnesses.

### A.      Jose Cadengo

The Court finds Jose Cadengo's testimony to be credible.  It is clear that he has extremely limited English language skills; indeed, he needed the assistance of an interpreter in order to testify at this trial. While it is easy for a party who feels he was duped in a deal to claim that he was pressured and not allowed a sufficient chance to read what he was signing, this Court is willing to believe Jose's testimony because every witness, including Konipol, described Vidaurre as being a small step above a loan shark.  Additionally, this Court finds that even if Vidaurre had given the Cadengos time to review the Transaction documents, Jose would not have been able to understand their legal effect because of his limited ability to comprehend English.  Accordingly, this Court finds Jose's testimony credible.

---

[12] All four witnesses were called by the Debtor.  The Defendants cross-examined each witnesses, but did not call any witness as part of their case-in-chief.

**B.     Nora Cadengo**

Nora Cadengo also testified with the aide of an interpreter and, like her ex-husband Jose, has limited English language skills.  Nora answered the questions to the best of her ability, and the Court finds that she was unaware of and unable to comprehend the documents that Vidaurre put before her at the closing on the Transaction.  Accordingly, this Court finds Nora's testimony to be credible.

**C.     Maria Cadengo**

The Court finds that the Debtor testified truthfully and to the best of her ability.  Maria was only 19 years old when the Transaction occurred, and only 21 years old when she testified at this trial.  She has not attended college and continues to reside with her father and her step-mother.  Her youth and lack of experience left her overwhelmed on the stand.  Whether due to naivete or an agreeable disposition, many of Maria's responses to leading questions seemed to be the product of her suggestibility rather than careful consideration.  For example, on cross-examination, she testified that she understood that the amount of the Transaction was going to be $34,000.00 and that the prior mortgage would be paid off.  On redirect, Maria's counsel had her clarify that the only reason she knew this information was because he had explained it to her at one of their pre-trial meetings.  The Court is unable to determine whether Maria entirely understood the difference between her present knowledge and the knowledge she had on the date of the Transaction.  Maria also testified that she signed the documents without reading them because she was brought to the closing on the Transaction and instructed to sign them by her parents.  Because she was following the direction of her parents, who were in turn following the direction of Vidaurre, the Court finds Maria credible when she claims that she simply signed the documents without actually reading or reviewing them.

**D.**     **Don Konipol**

Don Konipol testified as a representative of Wolverine.  His testimony was somewhat credible, but in certain respects was overly self-serving. For example, Konipol attempted to cast himself and his company as victims of the actions of Vidaurre just like the Cadengos, rather than as active participants in those actions.  At the time of the Transaction, Vidaurre and Konipol had a regular, ongoing business relationship.  Furthermore, Konipol is a native English speaker and a sophisticated business person who would not be easily deceived by Vidaurre.  Thus, insofar as he attempted to distance himself from the absent Vidaurre, the Court does not find him to be credible.

## IV.    CONCLUSIONS OF LAW

**A.**     **Jurisdiction and Venue**

The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157(b) and 1334.  This lawsuit is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (K) and (O).  Venue is proper pursuant to 28 U.S.C. § 1409(a).

**B.**     **Discussion of the Merits**

In her original Complaint, the Debtor pleaded that the Transaction was either a pretended sale of the Property which can be avoided under the Texas Constitution, or, in the alternative, was a disguised home equity loan, the terms of which violated the Texas Constitution.  The Court is unable to find that the Transaction was a pretended sale, but does find that it violated the provision of the Texas Constitution relating to home equity loans.

### 1.    Pretended Sale

One of the many protections provided to homesteads under the Texas Constitution is that

"All pretended sales of the homestead involving any condition of defeasance shall be void." Tex.

Const. art. XVI, § 50(c).[13] "[A] sale is "pretended" if the parties to the sale did not intend for title to

vest in the purchaser . . . Texas prohibits only those pretended sales that include a condition of

defeasance." *Perry v. Dearing (In re Perry)*, 345 F.3d 303, 312-13 (5th Cir. 2003) (citing *Hardie &*

*Co. v. Campbell*, 63 Tex. 292 (1885)). "A condition of defeasance permits the seller to reclaim the

title to the property conveyed after the loan is repaid." *Id.* at 313 (citing BLACK'S LAW DICTIONARY

428 (7th ed. 1999)).

"The question of whether an instrument written as a deed is actually a deed or is in fact a

mortgage is a question of fact.  The true nature of the instrument is resolved by ascertaining the

intent of the parties as disclosed by the contract or attending circumstances or both.  Even when the

instrument appears on its face to be a deed absolute, parol evidence is admissible to show that the

parties actually intended the instrument as a mortgage.  When there is a fact finding that the parties

intended the Transaction to be a loan, and that finding is supported by probative evidence, the law

will impute the existence of a debt." *Johnson v. Cherry*, 726 S.W.2d  4, 6 (Tex. 1987) (citations

omitted).

Here, there is sufficient evidence to establish that the parties did not intend to effectuate a

sale of the Property from Jose to Maria.  From the outset, the intention of Jose was to obtain a loan

so that he could afford to bring his new wife to the United States.  There is absolutely no evidence

to suggest that any of the Cadengos contemplated or communicated any desire to transfer the

---

[13] Hereinafter, all section references are to Article XVI of the Texas Constitution.

property to Maria. The idea to construct the Transaction as a sale to Maria solely originated with Vidaurre. In fact, the divorce decree, signed several years before the Transaction, clearly indicates that Jose and Nora intended that the Property should pass to Maria and Israel without any payment. All three of the Cadengos testified that Vidaurre said that he could not work with the Cadengos unless the loan amount was for at least $6,000.00. There was no caveat attached to this requirement that the Transaction also be a sale rather than a home equity loan. Thus, the Cadengos justifiably entered the Transaction believing that they were about to obtain a loan for $6,664.61.

At the closing of the Transaction, which notably lasted less than 20 minutes, Vidaurre made no attempt to make the Cadengos aware of the true nature of the Transaction. Vidaurre directed Nora and Jose where to sign all of the documents. Neither Vidaurre nor Goode spoke Spanish; no translator was present; and Maria was not given the opportunity to translate for her parents. The Court can reach no other conclusion than Vidaurre intended to dupe the Cadengos into signing the documents at the closing on the Transaction so that he could collect his excessive $5,000.00 fee—a fee nearly equal to the amount of proceeds that the Cadengos would receive from the Transaction. Three of the last four transactions that Vidaurre completed with Wolverine have resulted in lawsuits. This fact, combined Vidaurre's subsequent disappearance, support this Court's finding that Vidaurre intentionally misled and deceived the Cadengos into consummating the Transaction without ever understanding that it was a sale instead of a home equity loan.

However, to prove a pretended sale, it is insufficient that the parties did not intend for the Transaction to be a sale; Maria also has the burden to show the existence of a condition of defeasance as required by Tex. Const. art. XVI, § 50(c). A common example of a condition of defeasance is an option to repurchase at the end of the purported sale. *Nesco, Inc. v. Jay (In re Jay)*,

432 F.3d 323, 331 (5th Cir. 2005) (citing *Mosher Steel & Mach Co. v. Nash*, 6 S.W.2d 158, 162 (Tex. Civ. App.—Dallas 1928, writ dism'd w.o.j.)) (Higginbotham, J., dissenting).  The Debtor did not present evidence of any condition of defeasance in the deed or any of the papers executed at the closing on the Transaction, and adduced no testimony regarding any parole condition of defeasance. The Debtor's testimony was that she understood that, as a result of the Transaction, title to the Property was going to be in her name and not in the name of her father, Jose.  She did not testify about any plan to reverse the Transaction and give the property back to her father.  Thus, she did not allege any facts which could be construed as a condition of defeasance.

Further, Jose's testimony was that he believed that the Divorce Decree would automatically put title of the Property in the name of his two minor children upon their reaching 18 without the execution of a deed.  Therefore, he testified that at the time of the Transaction, he believed that Maria already had an interest in the Property.  Israel, who was not yet 18 at the time of the Transaction, did not testify and did not participate in the Transaction.  Presumably, Jose believed that he (i.e. Jose) owned at least half of the Property until Israel turned 18.  However, Jose did not testify that he intended to transfer all of the Property to Maria, and at some later time take back the half title that should have gone to Israel.  Thus, this Court is unable to find the presence of any condition of defeasance because (1) none of the Cadengos testified about any condition to the Transaction that would have revested title in Jose; and (2) the deed contains no such condition on its face.

Although the Cadengos did not fully understand the nature of the Transaction and intended to enter into a loan rather than a sale, the absence of a condition of defeasance requires this Court to hold that the Transaction was not a pretended sale under the Texas Constitution.  The Court next

14

considers the Debtor's alternative argument—that the Transaction was actually a home equity loan taken out by Maria and its terms violate the homestead protections of the Texas Constitution.

### 2.    Home Equity Loan

The Debtor's second cause of action is premised on the theory that the Transaction was actually a home equity loan taken out by Maria on her preexisting interest, not a sale from Jose to Maria. The predicate of such an argument, of course, is that the Property qualified as Maria's homestead at the time of the Transaction.

### a.    Despite not having legal title, Maria's equitable interest in the Property, coupled with her continual residence there, establishes her right to homestead protection under the Texas Constitution.

"A homestead is the dwelling house constituting the family residence, together with the land on which it is situated and the appurtenances connected therewith. The possession and use of real estate by one who owns it, and who, with his family, resides upon it makes it the homestead of the family in law and in fact. Moreover, the courts have always given a liberal construction to the Constitution and Statutes to protect homestead rights." *Lifemark Corp. v. Merritt*, 655 S.W.2d 310, 314 (Tex. App.—Houston [14th Dist.] 1983, writ ref'd n.r.e. ) (citations omitted). "[A]n individual who seeks homestead protection has the initial burden to establish the homestead character of her property. To meet this initial burden of proof, the claimant must "show a combination of both overt acts of homestead usage and the intention on the part of the owner to claim the land as a homestead." *Bradley v. Pac. Sw. Bank* (*In re Bradley*), 960 F.2d 502, 507 (5th Cir. 1992). Maria's homestead must have existed on the date of the Transaction and not established thereafter because "[A] previously acquired lien, whether general or special, voluntary or involuntary, cannot be subsequently defeated by the voluntary act of a debtor in attempting to make property his

15

homestead." *Inwood North Homeowners' Ass'n v. Harris*, 736 S.W.2d 632, 635 (Tex. 1987) (citing *Gage v. Neblett*, 57 Tex. 374, 378 (1882)).

Maria has permanently and continuously resided at the Property since the Cadengo family purchased it in 1993. The Defendants did not present any evidence to controvert this fact. The issue then is whether Maria held sufficient interest in the Property at the time of the Transaction in order to claim it as her—as opposed to Jose's—homestead.

Maria claims that the Property was her homestead on the date of the Transaction because she had a vested equitable interest in the property as a result of the Divorce Decree. The Defendants counter with case law holding that "[p]ossession and use of land by one who owns it and who resides upon it makes it the homestead in law and fact." *NCNB Tex. Nat'l Bank v. Carpenter*, 849 S.W.2d 875, 880 (Tex. App—Ft. Worth 1993, no writ) (citations omitted). Without any further supporting case law, the Defendants make the leap that the word "owns" in the above quotation refers exclusively to full legal title. This is simply not the case. Texas law has long held that "[o]wnership of the fee is not essential to the existence of a homestead . . . any sort of title, whether legal or equitable, will support a homestead claim." *Moore & Rollow v. J.W. Graham*, 69 S.W. 200, 201 (Tex. Civ. App.— San Antonio 1902, no writ); *see also Gibson v. Fauber*, No. 02-249, 2004 Tex. App. LEXIS 8289, at *29 (Tex. App.—Tyler Sept. 8, 2004, pet. denied); *West Tex. Const. Co. v. Adams*, 54 S.W.2d 547, 549 (Tex. Civ. App.—El Paso 1932, no writ) ("to sustain a claim of homestead one must have either legal or equitable title.").

The Divorce Decree awards the Property to Jose as his separate property: "Respondent JOSE ANTONIO CADENGO, is awarded the following as his sole and separate property, and Petitioner, NORA CADENGO, is hereby divested of all right, title, interest, beneficial interest, and claim in and

16

to such property." [Ex. No. 2, p. 9-10.] However, the Divorce Decree continues, "IT IS ORDERED AND DECREED that Petitioner, NORA CADENGO and Respondent, JOSE A. CADENGO shall both execute a warranty deed for the [Property] to the minor children once they have reached the age of 18 years." [*Id.* at p. 10.] The Defendants characterize this provision of the Divorce Decree as a promise by the parents to make a gift to the children, which did not create any equitable interest for the children, and the Defendants note that "a future interest in property with no present right of possession cannot claim a homestead right in property." *Lawrence v. Lawrence*, 911 S.W.2d 450, 453 (Tex. App.—Texarkana 1995, no writ).

The Court believes that the Defendants have incorrectly characterized the Debtor's interest in the Property as of the date of the Transaction—the only relevant date for this discussion.[14] The Divorce Decree included two contingencies to Maria and Israel taking title to the Property: (1) achieving the age of 18; and (2) a deed conveying the property to them. Maria reached the age of 18 prior to the Transaction taking place. Therefore, at the time of the Transaction, there was no remaining condition precedent to her father's obligation to convey one-half of the Property to her pursuant to the divorce decree. Thus, if Maria did not obtain equitable interest upon the entry of the Divorce Decree, she at least obtained an equitable interest on her 18th birthday.

The Supreme Court of Texas addressed the issue of a future interest holder attempting to establish a homestead in *Laster v. First Huntsville Prop. Co.*, 826 S.W.2d 125 (Tex. 1992). The divorce decree in *Laster* granted the wife the right to exclusive use and possession of the homestead until the youngest child reached the age of 18, at which time the property would revert to the

---

[14] The fact that Maria may have not had an equitable title in the Property immediately upon the execution of the Divorce Decree is irrelevant. Maria must only show that, prior to the date of the Transaction, she acquired sufficient title to support her homestead claim.

17

husband. Thus, the husband in *Laster* was in essentially the same position as Maria and Israel at the time of the execution of the respective divorce decrees. In *Laster,* the husband mortgaged his future interest and attempted to assert his homestead rights in the property eight years prior to the youngest child turning 18. *Id.* at 128. Since the condition precedent had not yet occurred, the husband still held only a future interest. The Texas Supreme Court held that the husband had no homestead claim because, at the time of the mortgage, he held only this non-possessory future interest. *Id.* at 129.

As described above, Maria is unlike the husband in *Laster* because on the date of the Transaction she had already turned 18, satisfying the condition precedent, and her future interest had become a present equitable title to the Property. An equitable title is a title "that indicates a beneficial interest in property and that gives the holder the right to acquire formal legal title." BLACK'S LAW DICTIONARY 1493 (7th ed. 1999). At any time after she turned 18 and before the Transaction, Maria could have sued Jose to force him to convey a deed to her in accordance with the terms of the Divorce Decree and would then have held formal legal title. The fact that she did not choose to compel her father to execute a deed, and her father's apparent breach of the Divorce Decree by not voluntarily doing so, does not divest her of equitable title in the Property because at the time she held the "right to acquire formal legal title." Therefore, the Court finds that, upon her 18th birthday, Maria had equitable title to the Property; and, coupled with her continuous residence at the Property, she has met her initial burden of proof in establishing her homestead claim.

Since Maria has established that her interest in the Property was protected as a homestead on the date of the Transaction, the burden shifts to the Defendants, as the challenging parties, to disprove the continued existence of the homestead. *Bradley*, 960 F.2d at 507. This is generally a difficult task: "The only way for property to lose its homestead, after it has been dedicated as a

homestead, is by death, abandonment or alienation." *Id.* (citing *Garrard v. Henderson*, 209 S.W.2d

225, 229 (Tex. App.—Dallas 1948, no writ).  Because Maria has neither died nor conveyed her

interest in the Property, the Defendants could only attempt to argue an abandonment of the Property.

However, instead of arguing that there was an abandonment, the Defendants turn to an argument

based on estoppel and waiver.

> **b.** **The fact that Debtor signed documents at the closing on the Transaction stating that the Property was not her homestead and that she resided somewhere else does not preclude the Debtor from being able to assert her homestead rights.**

The homestead section of the Texas Constitution allows a lender, under certain

circumstances, to rely upon an affidavit signed by the borrower declaring that the property is not the

borrower's homestead:

> A purchaser or lender for value without actual knowledge may conclusively rely on an affidavit that designates other property as the homestead of the affiant and that states that the property to be conveyed or encumbered is not the homestead of the affiant.  Tex. Const. art. XVI, § 50(a)(6)(Q)(xi)(d).

At the closing on the Transaction, several documents were executed stating that the Debtor's

homestead is at the address where her mother Nora resided.  One of these documents was the

"Nonhomestead Affidavit and Designation of Homestead" which was signed by Maria and stated

that:

> I do not now reside on the Nonhomestead Property nor do I claim it as either a business or residence homestead under the laws of Texas.  I do not presently intend to reside on the Nonhomestead Property or claim it as either a business or residence homestead.  I renounce and disclaim any homestead right, interest, or exemption in the Nonhomestead Property."  [Ex. No. 13, ¶ 1.]

While this is the type of affidavit that is contemplated by the Texas Constitution, the Court

finds that the Defendants may not claim shelter under §50(a)(6)(Q)(xi)(d) because (1) they had actual

knowledge that the Debtor resided at the Property and were made aware of the terms of the Divorce Decree whereby the Debtor obtained an equitable interest upon turning 18; and (2) even if the Defendants were without actual knowledge, Maria's actual use and possession of the Property imputes such actual knowledge to them.

First, the Court finds that the Defendants were not a "lender for value without actual knowledge" because, at the time of the Transaction, they had actual knowledge that the Debtor was residing at the Property and that she had a likely homestead claim. Nora testified that she brought a copy of the Divorce Decree to her initial meeting with Vidaurre upon his request, and furthermore she specifically directed Vidaurre to the relevant provision of the Divorce Decree granting Maria and Israel the Property upon turning 18. Nora, Jose, and Maria each testified that a copy of the Divorce Decree was present at the closing on the Transaction and was included with the rest of the paperwork of Goode. Konipol also admitted to visiting the Property with Vidaurre prior to approving the loan. Both Maria and Jose testified that they were present at the time of this visit. Accordingly, the Court finds that the Defendants had actual knowledge of Maria's homestead claim to the Property through being provided a copy of the Divorce Decree prior to the Transaction and because of Konipol's visit to the Property while Maria was living there as she had continuously since 1993.

Next, even if this Court's conclusion that the Defendants had actual knowledge of Maria's homestead claim is incorrect, there is case law holding that Maria's actual use and possession of the property negates the safe harbor of § 50(a)(6)(Q)(xi)(d). "Texas law is clear that a homestead claimant is not estopped to assert his homestead rights in property on the basis of declarations made to the contrary if, at the time of the declarations, the claimant was in actual use and possession of the property." *Truman v. Deason* (*In re Niland*), 825 F.2d 801, 808 (5th Cir. 1987). "No estoppel can

arise in favor of a lender or encumbrancer who has attempted to secure a lien on homestead property that is in actual use and possession of the homestead claimant, based solely upon declarations, whether written or oral, which state to the contrary." *Dominguez v. Castaneda*, 163 S.W.3d 318, 331 (Tex. App.—El Paso 2005, pet. denied) (citing *Sanchez v. Telles*, 960 S.W.2d 762, 770 (Tex. App.—El Paso 1997, pet. denied)); *see also Lincoln v. Bennett*, 138 Tex. 56, 156 S.W.2d 504, 506 (1941). "Moreover, when a homestead claimant is in actual occupancy of his homestead, it will be deemed that a lender or encumbrancer acted with knowledge of the occupant's right to invoke the rule of homestead." *Id.* (citing *NCNB Tex. Nat'l Bank v. Carpenter*, 849 S.W.2d 875, 880 (Tex. App.—Fort Worth 1993)). Thus, under § 50(a)(6)(Q)(xi)(d), a lender may rely upon a non-homestead affidavit only if it is without knowledge of the borrower's right to claim a homestead and the borrower is not in actual use and possession of the homestead property. Therefore, the Court finds that, in addition to having actual knowledge of Maria's homestead claim, the Defendants are also not able to rely upon her Nonhomestead Affidavit because at the time it was executed, Maria was in "actual use and possession" of the Property.

The Court concludes that the Property was the Debtor's homestead as of her 18th birthday, well before the date of the Transaction, and that the Defendants may not claim shelter under the safe harbor of §50(a)(6)(Q)(xi)(d) because: (1) they had actual knowledge that the Debtor resided at the Property and were made aware of the terms of the Divorce Decree whereby the Debtor obtained an equitable interest upon turning 18; and (2) even if the Defendants were without actual knowledge, Maria's actual use and possession of the Property imputes such actual knowledge to them.

  **c.** **Although the documents executed during the closing on the Transaction indicated a sale, the true nature of the Transaction was a home equity loan.**

Finally, the Court must determine the nature of the Transaction.  The Defendants urge this Court to view the Transaction as a sale of the Property to Maria.  The Debtor's position is that, since the proceeds from the Transaction were used to pay off the prior mortgage and provide the sum of $6,664.61 to Jose, the Transaction was actually a home equity loan.  The Court finds that the intent of the parties should prevail under these circumstances.  Maria understood the terms of the Divorce Decree and knew that she was entitled to own the Property with her brother in equal shares; it makes no sense that she would enter into a transaction to purchase the Property.  Likewise, Nora and Jose both testified that they intended the terms of the Divorce Decree to be effective and for the children to take the home; therefore, all parties, including Vidaurre, knew that the Transaction was supposed to take the form of a home equity loan.  Thus, because Maria already had equitable title to the home, and none of the parties intended to structure the Transaction as a sale, the Court finds that the Transaction was a home equity loan.

  **d.** **The Transaction violated several homestead protections found in Art. XVI, § 50(a)(6) of the Texas Constitution.**

"In Texas, homestead rights are sacrosanct." *In re Sissom*, No. 06-31917, 2007 Bankr. LEXIS 1683, at *86 (Bankr. S.D. Tex. May 11, 2007) (quoting *In re McDaniel*, 70 F.3d 841, 843 (5th Cir. 1995)).  Although the Texas Constitution now allows home equity lenders the right to foreclose on the borrower's homestead, the borrower is protected by a lengthy list of specific provisions with which the lender must comply with to avoid forfeiture of the entire principal and interest. *See* Tex. Const., art. XVI, § 50(a)(6).  The Debtor alleges that the Transaction violated several of these

22

provisions and that the Defendants should be required to forfeit all claims to the entire principal and interest.

The Debtor's first allegation is based on the Defendant's failure to obtain Israel's consent to the Transaction. Section 50(a)(6)(A) states that for a home equity loan to be valid, the written agreement must include "the consent of each owner." Section 50(a)(6)(Q)(xi) provides the opportunity for the lender to avoid forfeiture if the consent of all owners can be subsequently obtained. The Court has already held that Maria is an "owner" for purposes of establishing her homestead rights because on her 18th birthday her contingent interest transformed into vested equitable title. The Transaction occurred on December 10, 2004, and Israel turned 18 on July 2, 2006. For purposes of § 50(a)(6), Israel held only a contingent interest without the present right to possession and probably cannot be considered an "owner" whose consent to the Transaction needed to be obtained in light of the meaning of ownership in the context of establishing a homestead discussed above. Therefore, this allegation lacks merit.

Next, the Debtor alleges that the fees and costs associated with the Transaction violated the Constitutional limit. Section 50(a)(6)(E) provides that the loan may "not require the owner or the owner's spouse to pay, in addition to any interest, fees to any person that are necessary to originate, evaluate, maintain, record, insure, or service the extension of credit that exceed, in the aggregate, three percent of the original principal amount of the extension of credit." The total amount of proceeds from the Transaction was $34,000.00. Of this amount, $10,000.00 was paid to Wolverine and Premier as broker's fees and $3,866.88 was applied to closing costs. Thus, the total fees and costs of the Transaction were $13,866.88—40.8% of the original principal amount of $34,000.00. If the Transaction had complied with the three percent limit in the Texas Constitution, the total

23

allowable fees and costs would have been $1,020.00. The Defendants clearly violated § 50(a)(6)(E) by charging more than 12 times the allowed amount of costs and fees.

Section 50(a)(6)(C) provides that the home equity loan must be "without recourse for personal liability against each owner and the spouse of each owner, unless the owner or spouse obtained the extension of credit by actual fraud." The Court has already rejected the Defendants' claim that they were victimized by the Debtor. Since the Debtor did not obtain the extension of credit by actual fraud, the Transaction also violates the Texas Constitution because it failed to be "without recourse" as required by § 50(a)(6)(C).

There were several other violations of portions of § 50 including: (1) the failure to give the Debtor three days to rescind the Transaction pursuant to § 50(a)(6)(Q)(viii); (2) having the Debtor execute a deed of trust, rather than relying upon the limited right of sale subject to judicial foreclosure pursuant to § 50(a)(6)(D); (3) execution of the Loan Application on the same day as the closing, instead of the 12 day minimum period required by § 50(a)(6)(M); and (4) failure to provide the Debtor a separate notice of her home equity loan rights as required by § 50(g). Any of these violations would also be sufficient for the Court to find that the Transaction did not comply with the home equity lending requirements of the Texas Constitution.

        e.        **The remedy for the above-described violations of the Texas Constitution is forfeiture of the entire principal and interest of the extension of credit**

The penalties for violating the home equity loan provisions of the Texas Constitution are sharp and steep. Section 50(a)(6)(Q)(x) states that "the lender or any holder of the note for the extension of credit shall forfeit all principal and interest of the extension of credit if the lender or holder fails to comply with the lender's or holder's obligations under the extension of credit and fails

24

to correct the failure to comply not later than the 60th day after the date the lender or holder is

notified by the borrower of the lender's failure to comply." The statute then lists a number of

alternative methods that the lender may cure. The forfeiture penalty in § 50(a)(6)(Q)(x) has been

held to apply to all portions of § 50(a).

> When we read all the amendment's provisions together, we conclude that section
> 50(a)(6)(Q)(x) is a cure provision that applies to all of section 50(a) and is not limited
> to protecting the loan's principal and interest. Rather, this provision also operates as
> a cure provision that validates a lien securing a section 50(a)(6) extension of credit.
> To be valid, a home-equity loan must be made without recourse for personal liability
> against the homeowner. Tex Const. art. XVI, § 50(a)(6)(C). Therefore, if a lien that
> secures such a loan is voided, the lender is left with no method for recovering any
> sums extended to the borrower.

*Doody v. Ameriquest Mortgage Co.*, 49 S.W.3d 342, 345-46 (Tex. 2001). This language indicates

that the violation of any provision protecting homesteads from home equity loans could result in a

lender's forfeiture. The forfeiture reaches back to payments already made. *Adams v. Ameriquest*

*Mortgage Co.*, 307 B.R. 549, 553 (Bank. N.D. Tex. 2004). "Under this forfeiture provision, a

lender's failure to comply results in the lender having to not only forfeit the right to collect any future

payments called for under the note, but also having to disgorge any amount already paid under the

note."

The Texas Constitution provides offending lenders a 60-day window to cure violations so

as to avoid the heavy penalty of forfeiture. In this case, the running of the 60-day window to cure

began on July 17, 2006, the date that the Complaint was filed. *See Adams,* 307 B.R. at 558 (under

previous version of § 50(a)(Q)(x), the court held that the filing of an adversary proceeding containing

detailed allegations of the defects in the loan was sufficient notice). The Debtor's Complaint

specifically lists the portions of § 50(a)(6) and § 50(g) that she alleges were violated by the

Transaction.  The Court finds that the Defendants' 60-day window to cure began on the date of the filing of the Complaint and has since expired.  Therefore, the Defendants shall not have a claim for any of the principal or interest from the Transaction, and accordingly there can be no lien upon the Property.  Additionally, the Debtor has made payments of $4,201.41 since the closing on the Transaction [Docket No. 20, ¶ 12], and the Defendants must disgorge these amounts.  While this may seem like a windfall to the Debtor, the harsh penalties are plainly proscribed by the Texas Constitution.  Section § 50(a)(6)(Q) is designed as a deterrent to potential home equity lenders so that innocent, unsophisticated parties such as the Cadengos are not exploited.

## V. CONCLUSION

The Court finds that on the date of the Transaction, the Debtor had established a valid homestead in the Property.  Next, the Court finds that the substance of the Transaction was a home equity loan, thereby invoking the protections of the Texas Constitution.  The Defendants are unable to rely on the Debtor's homestead waiver executed at the closing on the Transaction because it was they had actual knowledge of the Debtor's use and possession of the Property.  Finally, the Court finds that the Transaction violated several sections of the Texas Constitution and the Defendants shall be required to forfeit the entire principal and interest of the loan—including prepetition payments of $4,201.41.

A corresponding Judgment will be entered on the docket simultaneously with the entry of this Memorandum Opinion.

Signed on this 27th day of June, 2007.

Jeff Bohm
U.S. Bankruptcy Judge